**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **v.** | **NO.  15-496-9** |
| **ANTHONY HALL** | |

**MEMORANDUM OPINION**

Following a six-day trial, a jury convicted Anthony Hall of conspiracy to distribute 100

grams or more of phencyclidine (PCP), in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B),

and two counts of possession with intent to distribute PCP, in violation of 21 U.S.C. § 841(a)(1)

and (b)(1)(C).  He has now filed a *pro se* Motion to vacate his convictions under 28 U.S.C.

§ 2255 on the basis that his trial and post-trial counsel separately provided ineffective assistance

of counsel.  For the reasons described below, his Motion will be denied.

## I.    FACTUAL BACKGROUND

### A.  Trial

From March 2015 through September 18, 2015, Hall was one of several distributors in a

PCP-trafficking ring in Philadelphia.  Nayeem Gordon headed the operation, obtaining PCP from

a supplier, Ishmi Powell.  With help from his brother and nephew, Nayeem would distribute the

drugs to a trusted inner circle of middlemen, including Hall, who would then sell it to customers.

The operation functioned like a business: Nayeem obtained PCP, set prices, and coached his

distributors; in return, the distributors reported how quickly the product was "rolling," relayed

customer feedback, and brought back cash to purchase more PCP or pay off PCP obtained on

credit.  All of this enabled the operation to flourish, with each link in the chain working toward a

common goal of obtaining, selling, and profiting from the sale of PCP.

The investigation of Nayeem's enterprise began in March 2015 when Manuel Cruz, then on probation, approached law enforcement to report that Nayeem was selling PCP from a stash house. The Drug Enforcement Administration (DEA), seeing an opportunity to capitalize on Cruz's established relationship with Nayeem, decided to use Cruz as a confidential informant who would make controlled purchases. To do so, DEA policy required agents to obtain permission from Cruz's probation office or supervising judge. Importantly, at trial, there was a dispute about when the DEA obtained this authorization. Between mid-March and mid-June 2015, under DEA supervision, Cruz made nine controlled purchases of PCP from Nayeem or one of his posse at or just outside of the alleged stash house. Agents monitored these transactions through mobile surveillance and a pole camera.

Information gathered from the controlled buys enabled law enforcement to obtain court-authorized wiretaps on phones used by Nayeem and Powell. With those wiretaps in place, agents began matching phone numbers to individuals involved in the operation. Between June 17 and August 27, they intercepted seventy-nine drug-related calls between Nayeem and a phone number ending in 2965. Although that line was subscribed in the name "Andre Ramsey," DEA Special Agent Frank Sampson testified that the number actually belonged to Anthony Hall.

Throughout the intercepted communications—recordings of which were played for the jury—Hall, Nayeem, and others used coded words to discuss the PCP. Some of these terms referred to the PCP and the amount being distributed, including "a single," "a circle," "a soda," "apple juice," "apple," "wet," and "oil." The conspirators also used numbers to refer to both the quality and the price of the PCP and referred to the color of the PCP using terms such as "clear," "light," "dark," "green," "brown" and "gold." The government argued that the calls to Nayeem involving the 2965 number showed Hall repeatedly ordering distributable quantities of PCP,

coordinating PCP sales, reporting back on sales and customer reactions, and discussing payments and re-supplies.

Agents eventually executed a search warrant at the stash house—a three-story mixed-use building at 3140 North Broad Street with a hair salon on the first floor and apartments on each floor. They recovered over a kilogram of PCP from the second-floor apartment, along with bottles, funnels, and other packaging materials. They also found documents in the first-floor rear unit indicating Hall was the lessee. Anyone entering 3140 North Broad through the back door could reach the second floor only by passing through the first-floor unit.

Taken together—the controlled buys, the layout and importance of 3140 North Broad, the intercepted calls, the identification of Hall as the user of the 2965 phone, and the drugs seized—the government contended that Hall was a mid-level distributor within Nayeem's operation.

Hall's core defense was that the prosecution had "the wrong person." His trial attorney, Vernon Chestnut, emphasized that no witnesses ever saw him sell or possess drugs, and no PCP was recovered from his apartment. In further arguing misidentification, Chestnut contended that Hall was never the person using the 2965 phone number. He stressed the fact that during one of the calls between Nayeem and the 2965 number, Nayeem referred to the other caller as "Rell" instead of Hall's nickname, "Tone." In the alternative, even if the jury believed that speaker was Hall, Chestnut argued that the coded conversations were undecipherable or referred instead to marijuana. And rather than demonstrating a conspiracy, Chestnut argued that the calls at most depicted a buyer-seller relationship between Nayeem and Hall, which would be insufficient to find Hall guilty on the conspiracy count.

On October 30, 2019, after a few hours of deliberating, the jury found Hall guilty of

conspiracy and of two of four charged counts of possession with intent to distribute PCP.

### B.  Post-Trial Procedural History

Following the guilty verdicts, Hall wished to file post-verdict motions under Federal Rules of Criminal Procedure 29 and 33.  On November 13, 2019, upon Chestnut's motion, the Court granted an extension to file them.  Just days before they were due, Chestnut fell ill, which precipitated two additional extensions of time that pushed the filing deadline to May 5, 2020. That date passed without any submission, and days later Chestnut moved to withdraw as counsel, citing ongoing health problems.  The motion was granted, and Brian J. Zeiger was appointed to represent Hall.  Zeiger's representation was short-lived: three months later, he withdrew due to a conflict of interest.  José Luis Ongay was then appointed to represent Hall in all future matters.

Shortly thereafter, Ongay advised the Court and Hall that other matters required his attention through January 2021 and, on that basis, obtained a fourth extension of time to file post-verdict motions by February 22, 2021.  That deadline also expired without any filing. Nevertheless, in July 2021, Ongay wrote the Court to report that the motions were nearly complete and would likely be filed within two weeks.  For reasons not apparent from the record, he did not file the motions until February 9, 2022—nearly one year after the extended deadline. They were therefore denied as untimely.

Ultimately, in March 2023, Hall was sentenced to 130 months of imprisonment, four years of supervised release, and a special assessment.  He filed a timely direct appeal of his conviction to the Third Circuit but voluntarily withdrew it pursuant to Federal Rule of Appellate Procedure 42(b).  He has now moved to vacate his conviction pursuant to 28 U.S.C. § 2255.

## II.  DISCUSSION

28 U.S.C. § 2255 provides a means for defendants to attack collaterally a federally

imposed sentence.  *See Davis v. United States*, 417 U.S. 333, 343 (1974) ("[Section] 2255 was

intended to afford federal prisoners a remedy identical in scope to federal habeas corpus.").  It

authorizes a court to vacate, set aside, or correct a sentence where, as relevant here, "the sentence

was imposed in violation of the Constitution or laws of the United States."  28 U.S.C. § 2255(a).[1]

In his § 2255 Motion, Hall argues that two instances of ineffective assistance of counsel resulted

in his sentence being imposed in violation of his Sixth Amendment right to counsel.  *See*

*Strickland v. Washington*, 466 U.S. 668, 686 (1984) (reaffirming that "the right to counsel is the

right to the effective assistance of counsel" (citing *McMann v. Richardson*, 397 U.S. 759, 771

n.14 (1970))); *see also* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall

enjoy the right . . . to have the Assistance of Counsel for his defence.").[2]

---

[1] A prisoner must be "in custody" at the time he files his § 2255 petition.  *See Carafas v. LaValle*, 391 U.S. 234, 238 (1968) ("The federal habeas corpus statute requires that the applicant must be 'in custody' when the application for habeas corpus is filed."); *see also* 28 U.S.C. § 2255(a).  Here, Hall was imprisoned at the time he filed his petition and therefore meets the "in custody" requirement.  The fact that he has since commenced supervised release does not moot his petition for the following reasons.  First, "once the federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to completion of proceedings on such application." *Carafas*, 391 U.S. at 238.  And second, in any case, a defendant on supervised release is "in custody" for purposes of § 2255.  *United States v. Essig*, 10 F.3d 968, 970 n.3 (3d Cir. 1993), *superseded on other grounds by rule*, 3d Cir. L.A.R. 31.3 (2002), *as recognized in United States v. Turner*, 677 F.3d 570, 578 (3d Cir. 2012).

[2] Before proceeding, the Court observes that there is a timeliness issue with Hall's petition.

The Antiterrorism and Effective Death Penalty Act of 1996 provides that a one-year period of limitation applies to § 2255 motions for post-conviction relief.  *Lloyd v. United States*, 407 F.3d 608, 611 (3d Cir. 2005); 28 U.S.C. § 2255(f).  The limitation period commences on one of four dates, only one of which is relevant here: "the date on which the judgment of conviction becomes final."  28 U.S.C. § 2255(f)(1).  As Hall acknowledges in his Motion, his conviction became final on April 8, 2024, when the Third Circuit granted his request to withdraw the direct appeal of his conviction.  *See Kapral v. United States*, 166 F.3d 565, 569 (3d Cir. 1999) (holding that a conviction becomes "final" within the meaning of § 2255 on the either date that the conviction and sentence are affirmed on the merits during appellate review or when the time to seek such review expires, whichever is later).  Hall therefore had until April 8, 2025, to file a timely collateral petition.  But the petition currently under review was filed nearly four months later—no earlier than August 5, 2025.  *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998) (holding a *pro se* § 2255 petition "is deemed filed at the moment [the defendant] delivers it to prison officials for mailing to the district court").

The government does not argue that Hall's petition should be dismissed on timeliness grounds.  *See United States v. Bendolph*, 409 F.3d 155, 164 (3d Cir. 2005) (en banc) (reaffirming that "the limitations period is not jurisdictional and therefore is subject to equitable considerations such as waiver").  And although the Court has the discretion to raise the timeliness issue *sua sponte*, *id.* at 158, it declines to do so here, *see, e.g.*, *United States v. Hampton*, 2014

Ineffective assistance of counsel claims are evaluated under the two-part framework articulated in *Strickland v. Washington*.  First, the defendant must show that counsel's performance was deficient, meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  Second, the defendant must show that the deficient performance prejudiced his defense. *Id.*  Although a defendant must demonstrate both components to succeed, a court deciding an ineffective assistance claim need not address both if there is an insufficient showing on one. *Id.* at 697.

### A.  Hall's Claims Are Not Procedurally Defaulted

As a threshold issue, the government contends that Hall's ineffectiveness claims are procedurally defaulted and therefore cannot be considered unless Hall shows cause and prejudice.  It argues that Hall defaulted when he voluntarily withdrew his direct appeal to the Third Circuit.

As a general rule, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." *Massaro v. United States*, 538 U.S. 500, 504 (2003) (citations omitted).  This doctrine, referred to as the procedural default rule, operates "to conserve judicial resources and to respect the law's important interest in the finality

---

WL 317875, at *3 n.2 (E.D. Pa. Jan. 28, 2014) (choosing to decide an untimely § 2255 motion on the merits where the parties failed to address timeliness).

Initially, in or about February 2025, Hall filed a timely § 2255 motion raising the same claims as those raised in this Motion.  That other petition, however, was dismissed without prejudice, after the one-year period of limitation had expired, because it did not use this District's standard form for § 2255 motions, crafted to apprise defendants of the various timing and procedural limitations applicable to § 2255.  *See* E.D. Pa. Loc. Civ. R. 9.4(B)(1)(a) ("Motions seeking relief under 28 U.S.C. § 2255, shall be submitted on the standard form supplied by this Court, and shall provide all of the information required by the form").  The instant Motion uses the appropriate form.  Accordingly, under these circumstances—where the government has not pressed the limitations defense, the untimeliness stems from Hall's failure to use a form intended for his benefit, and Hall's subsequent correction—justice is best served by reaching the petition's merits. *See Day v. McDonough*, 547 U.S. 198, 209 (2006) ("[D]istrict courts are permitted, but not obliged, to consider, *sua sponte,* the timeliness of a . . . habeas petition.").

of judgments" by inducing litigants to raise their arguments at the earliest instance. *Id.* In *Massaro*, the Supreme Court held that ineffectiveness claims are an exception to the procedural default rule. *Id.* In that case, the defendant had directly appealed his racketeering conviction, arguing that the district court had erred in admitting newly discovered evidence. *Id.* at 502. After the court of appeals affirmed the conviction, the defendant then brought a § 2255 petition asserting that his trial counsel was deficient in investigating the newly discovered evidence. *Id.* The district court and court of appeals held that the ineffectiveness claim was procedurally defaulted because it was not raised on direct appeal. *Id.* at 502-03.

The Supreme Court reversed. *Id.* at 509. It reasoned that a rule requiring ineffectiveness claims to be raised on direct appeal would require courts to decide the claim on a record ill-suited for doing so and would present obstacles for appellate counsel. *Id.* at 504-06. The Court held "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Id.* at 504. Therefore, despite the fact that Hall withdrew his direct appeal, he has appropriately raised his ineffectiveness claims for the first time in his § 2255 Motion. Under *Massaro*, the claims are not procedurally defaulted, and Hall need not show cause and prejudice for them to be considered.

### B. Ineffectiveness of Trial Counsel

Hall maintains that his trial counsel, Vernon Chestnut, was ineffective for only one reason: failing to object to and expose "materially false" testimony from Special Agent Frank Sampson concerning DEA authorization to use Manuel Cruz as a confidential informant.

Cruz was on probation when he alerted law enforcement to Nayeem's PCP operation. Because of that status, as noted earlier, DEA policy required verbal authorization from Cruz's probation officer, one of her supervisors, or Cruz's supervising judge before he could work

undercover.  Cruz ultimately made nine controlled purchases of PCP, the first on March 11,

2015.  Sampson testified that it was his "understanding" that the DEA received verbal approval

from Cruz's probation officer prior to that first purchase.  But, as Hall's Motion notes, trial

evidence established that the DEA did not have approval until nearly a month later.  The

government did not contend, and no witness testified, that Hall was involved in any of Cruz's

controlled purchases.  Thus, for the prosecution, evidence about the controlled buys went

primarily to proving the existence of a conspiracy by establishing how it operated and who was

involved in it.  Meanwhile, for the defense, exposing the issue of when the DEA obtained

authorization would tactically impeach Sampson, the government's key trial witness, and

undermine the integrity of the DEA's investigation.

Hall's ineffectiveness claim on this issue fails under *Strickland*'s performance prong.

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the

defendant must show that counsel's representation fell below an objective standard of

reasonableness," as measured by "prevailing professional norms."  *Strickland*, 466 U.S. at 687-

88.  "Judicial scrutiny of counsel's performance must be highly deferential," *id.* at 689, and a

court should "'indulge a strong presumption' that, under the circumstances, counsel's challenged

actions 'might be considered sound strategy,'" *Buehl v. Vaughn*, 166 F.3d 163, 169 (3d Cir.

1999) (alteration omitted) (quoting *Strickland*, 466 U.S. at 689).  Only a "rare" claim will

succeed under this deferential standard.  *Id.* (citation omitted).

The trial transcripts show that Chestnut's performance on this issue was not only

objectively reasonable, but also directly contrary to Hall's premise: far from ignoring the timing

discrepancy, Chestnut identified and exploited it repeatedly in front of the jury.  He made the

authorization timeline a centerpiece of his effort to portray the DEA as blind to protocol as well

as to evidence suggesting that someone other than Hall was connected to the 2965 telephone number.

Chestnut laid the groundwork in his opening statement. He told the jury they would see "mistakes," "missteps," and "misrepresentations" in the DEA's investigations, and he specifically previewed that agents allowed Cruz to conduct controlled purchases before receiving authorization. In other words, from the outset, he framed the authorization issue as a credibility and protocol problem.

When the government called Cruz as a witness, Chestnut used cross-examination to introduce the point. Cruz testified that someone at the DEA assured him "everything was tooken [sic] care of" before the first controlled purchase, but he caveated that his probation officer did not tell him he was cleared until April. His testimony thus suggested that the DEA proceeded without the required authorization and, more problematically, did so by misleading him.

Later at trial, the jury heard from Sampson. On direct, he stated that he believed the DEA had obtained verbal approval from Cruz's probation officer before the first buy in March, that he never learned otherwise, and that Cruz would have been immediately deactivated if he had so learned. Recognizing the importance of this testimony—and after receiving "a whole bunch of notes" from Hall about points to cover—Chestnut requested and received permission to defer his cross-examination until the next trial day in order to prepare. On cross, Chestnut pressed Sampson on whether he had contacted Cruz's probation officer or supervising judge. Sampson responded that he could not recall speaking to the probation officer, and that he did not contact the judge. By that point, Chestnut had substantially exposed the DEA's failure to follow its own guidelines, potentially weakening Sampson's credibility and the investigation's integrity.

But Chestnut did not stop there. After the government rested, the first defense witness

was Cruz's probation officer, Melissa Lawless.  Lawless testified that Sampson contacted her on March 9 to seek authorization.  On March 10—the day before the first controlled buy—Lawless emailed Sampson to say that, after conferring with her supervisor and director, she would have to seek approval from the supervising judge.  She further testified that the judge granted permission on April 6, 2015, and that she forwarded that approval to DEA the same day.  Her testimony thus directly contradicted Sampson's "understanding."

Finally, in closing argument, Chestnut tied all this testimony together.  He walked through the timeline—initial contact on March 9, four purchases between March 11 and April 2, formal approval on April 6—and urged the jury to see the DEA's "arrogance of power" in believing that "[it] can just do whatever."  Contending that the DEA believed "it was more important to have [its] confidential source than to follow the . . . protocol," Chestnut then argued that the DEA's "arrogance" also infected its conclusion that Hall was on the other end of Nayeem's calls with the 2965 phone number.

Thus, Hall's claim that Chestnut failed to challenge Sampson's testimony is flatly contradicted by the record.  Chestnut not only elicited the key facts showing that Cruz was used before the DEA had obtained formal approval, but he also structured his opening, cross-examinations, witnesses, and closing to highlight the breach of protocol.  Under *Strickland*'s deferential standard, these are exactly the kinds of tactical choices that "might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689.  Hall cannot show that Chestnut's performance fell below an objective standard of reasonableness.[3]  That the jury convicted Hall despite this line of attack reflects not a deficiency in Chestnut's performance but rather the

---

[3] Chestnut's performance is all the more reasonable considering the amount of time he had to prepare.  Up until the first day of trial, Hall had been proceeding *pro se* with Chestnut acting standby counsel.  Shortly before voir dire, Hall informed the Court that Chestnut would serve as trial counsel.

limited relevance of the issue on Hall's guilt: whether the DEA had authorization to use Cruz on some of the controlled purchases did not change the fact that they occurred.

## C. Ineffectiveness of Post-Trial Counsel

Hall next claims that his post-trial counsel rendered ineffective assistance by failing to file timely post-verdict motions under Federal Rules of Criminal Procedure 29 and 33. To recap: after the jury returned its verdict, Hall received four extensions of time to file these motions. Chestnut obtained the first three extensions but ultimately did not file anything. He later withdrew as Hall's counsel. Approximately four months later, Hall's new counsel, José Luis Ongay, moved the Court to issue a schedule for post-verdict motions that would accommodate his other representations. The Court granted that motion and ordered that any such motions be filed by February 22, 2021. Ongay, however, filed them on February 9, 2022—nearly a year late. They were therefore denied as untimely. Critically, Hall's § 2255 petition with respect to Ongay focuses only on his failure to comply with the court-ordered deadline.

Even assuming Ongay's tardiness was deficient, Hall's argument fails under *Strickland*'s prejudice prong, to wit: "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Accordingly, "ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice," meaning the defendant must show that counsel's error "actually had an adverse effect on the defense." *Id.* at 693.

As the Supreme Court explained in *Strickland*, "[t]he Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Id.* at 685. Generally, courts apply

11

a "'strong presumption of reliability' to judicial proceedings." *Roe v. Flores-Ortega*, 528 U.S. 470, 482 (2000) (citing *Smith v. Robbins*, 528 U.S. 259, 286 (2000)). But that presumption is overcome where the defendant shows how "specific errors of counsel undermined the reliability" and fairness of the criminal process. *Id.* (citing *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984)); *see also Kimmelman v. Morrison*, 477 U.S. 365, 374-75 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."). "Attorney errors come in an infinite variety," *Strickland*, 466 U.S. at 693, and at any stage of the criminal proceeding. Accordingly, the required showing of "actual prejudice" depends on the context and import of counsel's mistake. *See Ellison v. United States*, 120 F.4th 338, 343, 345 (3d Cir. 2024) ("Prejudice is defined in different ways depending on the context in which it appears." (citing *Weaver v. Massachusetts*, 582 U.S. 286, 300 (2017)).

Relatively straightforward is the case where the attorney error occurs during trial. Counsel's envisioned role in that context is clear: "to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland*, 466 U.S. at 687. To create sufficient doubt about whether counsel's error undermined the correctness of a conviction, a defendant generally "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Put differently, the defendant must demonstrate that the alleged error "affected the jury's verdict" by evaluating counsel's mistake in light of "the rest of the evidence produced at trial." *Ellison*, 120 F.4th at 345 (citing *Palmer v. Hendricks*, 592 F.3d 386, 399 (3d Cir. 2010)). So, for example, if the defendant alleges the attorney error deprived her of the right to testify and to

12

present a defense at trial, she must "show a reasonable probability that, but for counsel's errors, she would have exercised her trial rights, and that doing so would have changed the result." *Id.* at 345-46.

The attorney error can also "aris[e] from other stages of the adjudicative process." *Id.* at 343. For example, in *Hill v. Lockhart*, the defendant alleged that his counsel's erroneous advice induced him to accept a plea deal. 474 U.S. 52, 55-56 (1985). Recognizing that such a mistake undermined reliability in "the outcome of the plea process," the Supreme Court held that a defendant could demonstrate his counsel was constitutionally ineffective by showing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59; *see also Lafler v. Cooper*, 566 U.S. 156, 163-64 (2012) (holding, in a case alleging counsel's ineffective advice led to the improvident rejection of a plea deal, that a defendant could demonstrate prejudice by showing, but for counsel's error, he would have accepted the deal, the prosecution would not have withdrawn it, the court would have accepted its terms, and that the terms would have been more favorable than the judgment and sentence imposed at trial).

In a similar vein, "where a defendant claims ineffective assistance based on a pre-trial process that caused him to forfeit a constitutional right," such as the right to a jury trial, "the proper prejudice inquiry is whether the defendant can demonstrate a reasonable probability that, but for counsel's ineffectiveness, he would have opted to exercise that right." *Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 857 (3d Cir. 2017). And in the post-trial context, where counsel's deficient performance deprives a defendant of an appeal, the defendant need only show a reasonable probability that he would have timely appealed. *Flores-Ortega*, 528 U.S. at 484. If the defendant had no intention to appeal, then counsel's deficiency could not have

prejudiced the defense.  *Id.*

In this case, the alleged attorney failing occurred at the post-conviction, pre-sentencing stage of the criminal process.  None of the foregoing cases precisely identify the prejudice standard to apply in this context, but they elucidate that the ultimate concern for purposes of the Sixth Amendment is whether and how counsel's alleged error affected "the fairness and regularity of the [post-conviction] processes."  *Lafler*, 566 U.S. at 169.  In this circumstance, because Rules 29 and 33 motions focus on what transpired at trial, the reliability of the post-conviction process is inextricably entwined with the "reliability of [the] conviction."  *Id.*  Thus, the prejudice inquiry here is whether there is a reasonable probability that timely post-verdict motions would have produced a different result for Hall—*i.e.*, whether there is a reasonable probability the Court would have granted judgment of acquittal under Rule 29 or a new trial under Rule 33.  The prejudicial effect of Ongay's error necessarily depends on the meritoriousness of the arguments Hall would have raised in timely submissions.  *Cf. Ellison*, 120 F.4th at 345 ("The prejudicial effect will necessarily depend on the significance of the facts to which the defendant and her witnesses might have testified, evaluated alongside the rest of the evidence produced at trial.").

The conclusion that the prejudice inquiry here demands a reasonable probability of the motions being granted is buttressed by the Supreme Court's decision in *Kimmelman v. Morrison*. In that case, the defendant's trial counsel failed to conduct *any* pretrial discovery, so when at trial the prosecution sought to introduce evidence allegedly obtained without a search warrant, counsel moved to suppress it.  *Id.* at 369.  The trial court, however, held the suppression motion was out of time, and the defendant was eventually convicted.  *Id.* at 369, 371.  The defendant later filed a writ of habeas corpus, alleging counsel was ineffective in failing to file a timely

suppression motion. *Id.* at 371. The Supreme Court did not hold that the defendant merely needed to show a reasonable probability that he would have filed the suppression motion. Instead, observing that *Strickland* prejudice requires proving "the result of the proceeding would have been different," the Court held that the defendant had to "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Id.* at 375 (citation omitted).

In light of *Kimmelman*, the prejudice analysis must likewise turn on the discretionary, post-verdict motions' substance and likely success, not merely on the lost opportunity to file them. *Kimmelman* implicitly rejected the notion that prejudice can be established only by showing that counsel would have timely filed the suppression motion. Instead, because *Strickland* asks whether the error likely changed the result, the defendant had to show the suppression argument had merit and that success on it would likely have altered the verdict. The same logic applies here. Rules 29 and 33 are vehicles to obtain concrete relief in light of the trial evidence: acquittal for legal insufficiency (Rule 29) or a new trial in the interest of justice (Rule 33). If Hall cannot show that a timely Rule 29 motion would likely have been granted based on insufficiency, or that a timely Rule 33 motion would likely have been granted based on injustice, then Ongay's tardiness, even if deficient, did not "actually ha[ve] an adverse effect on the defense," and the "strong presumption of reliability" attached to the jury's verdict remains intact. *Strickland*, 466 U.S. at 693, 696.

Turning to Hall's petition, apart from contending that Ongay's inaction led to the forfeiture of "potential relief," Hall makes no argument about the likelihood of the post-verdict motions succeeding. *See Hill*, 474 U.S. at 60 (assessing prejudice based on the allegations in the

habeas petition); *Palmer*, 592 F.3d at 394 ("Palmer's petition comes up short because it fails to make an adequate showing of prejudice.").  Indeed, as the government notes, the petition does not even identify any particular argument in those motions.  Where a § 2255 petition omits discussion about the likelihood of a post-verdict motion succeeding, it is appropriate to deny relief.  *See, e.g.*, *Tibbs v. United States*, 2018 WL 1282415, at *3 (11th Cir. Jan. 30, 2018) (finding no prejudice where the defendant failed to demonstrate that a renewed Rule 29 motion would have been successful); *United States v. Lutcher*, 2009 WL 1457980, at * 6 (E.D. La. May 26, 2006) ("Since the defendant has not shown that a Rule 29 motion would have had a reasonable probability of success, he has failed to demonstrate prejudice under the second Strickland prong.").  Because Hall must "affirmatively prove prejudice," *see Strickland*, 466 U.S. at 693, yet he does not demonstrate a reasonable probability of a different outcome, his petition will be denied.

For the sake of thoroughness—and because the Court has an obligation to construe *pro se* § 2255 petitions liberally, *United States v. Miller*, 197 F.3d 644, 648 (3d Cir. 1999)—a review of Hall's untimely motions and the government's response confirms he would not have been acquitted under Rule 29 or granted a new trial under Rule 33.  Starting with the Rule 33 motion, Hall argued that there was a "serious danger that a miscarriage of justice has occurred," *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (citation omitted), because the verdict was against the weight of the evidence.  But even if Ongay had filed this motion by the fourth extended deadline, there is no chance it would have been granted; by that point, the Court was without authority to grant a new trial under Rule 33.  That is because the deadline for filing Rule 33 motions is jurisdictional, meaning "a district court is powerless to entertain such motions out of time."  *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987) (citations omitted).  In this

16

case, the jurisdictional deadline elapsed when Chestnut, not Ongay, failed to file post-verdict motions by the third extended deadline. So, despite Ongay obtaining a fourth extension, the Court could not have granted Hall a new trial. *See id.* (reversing the grant of a new trial where the Rule 33 motion "was out of time, even though the motion was made with permission of the court"). Hall therefore suffered no prejudice on account of Ongay's inaction on the Rule 33 motion.

Nor would Hall have been acquitted under Rule 29. While a court has discretion to grant an untimely Rule 29 motion for judgment of acquittal, *see United States v. Giampi*, 758 F.2d 928, 936 n.1 (3d Cir. 1985), the standard for doing so is extraordinarily demanding. "A judgment of acquittal is appropriate under Federal Rule of Criminal Procedure 29 if, after reviewing the record in a light most favorable to the prosecution, [the court] determine[s] that no rational jury could have found proof of guilt beyond a reasonable doubt." *United States v. Baroni*, 909 F.3d 550, 561 (3d Cir. 2018), *rev'd on other grounds sub nom.*, *Kelly v. United States*, 590 U.S. 391 (2010). A finding of insufficiency should be reserved for those situations in which "the prosecution's failure is clear." *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010). "Courts must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). The evidence must not be viewed piecemeal; the question is instead "whether all the pieces of evidence, taken together, make a strong enough case to let a jury find the defendant guilty beyond a reasonable doubt." *Id.* at 134 (internal brackets omitted).

First, Hall argued there was insufficient evidence to identify him. As an initial matter, contrary to Hall's contention, the government introduced pole camera footage depicting Hall

with Nayeem Gordon and other coconspirators outside of 3140 North Broad during the course of the conspiracy.  But more importantly, the evidence proving Hall's identity in the charged crimes mainly consisted of Hall's own words during intercepted phone calls with Nayeem Gordon.  In those conversations, Hall and Nayeem organized PCP transactions, coordinated pricing, discussed customers' feedback, and arranged for payments.

Second, on that issue, Hall argued there was insufficient evidence to conclude that he was the speaker on the wiretapped calls.  He emphasized that the 2965 phone number was not found in his possession nor subscribed in his name, that Nayeem referred to the other speaker as "Rell" on one of the calls, and that Sampson was not credible in explaining how he identified Hall's voice.  These arguments are in tension with the Rule 29 standard.  At base, Hall's numerous points about the 2965 number asked the Court to re-weigh the evidence in Hall's favor and make credibility determinations.  But in a sufficiency of the evidence challenge, it is not the Court's role to act as a "thirteenth juror," substituting its own judgment for the jury's rationally based conclusions.  *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013).

Indeed, there was overwhelming evidence supporting the jury's conclusion that Hall was the speaker on the intercepted calls.  Most importantly, Sampson testified that he concluded the 2965 phone number belonged to Hall because: (1) a subpoenaed utility bill for Hall's apartment listed the 2965 number as a point of contact; (2) Sampson reviewed 175 intercepted calls in which the speaker on that line identified himself as "Tone"—short for Anthony—and matched that voice to the drug-related calls;[4] and, (3) upon executing a lawful search of the phone, agents found an incoming text message reading, "Good afternoon Mr. Hall," an outgoing text to

---

[4] The match was further corroborated by a subsequent in-person conversation between Hall and Sampson, as well as Sampson hearing Hall's voice during proceedings in that portion of the case in which Hall had represented himself *pro se*.

Nayeem, and an outgoing text mentioning "Tone."  Furthermore, the jury did not have to rely solely on Sampson's attribution of the calls to Hall.  They too heard some of the intercepted conversations, were free to come to their own conclusions about the speaker's identity, and ultimately agreed with Sampson's identification.  Hall's wish that the jury had weighed the evidence differently is no basis for an acquittal.

Third, as to the conspiracy conviction, Hall argued that even if the evidence sufficiently identified him as a participant in the crimes, there was insufficient evidence to prove he was a co-conspirator.  Instead, he contended he was "at best an alleged buyer of Nayeem Gordon." The evidence at trial, however, established that Hall, Nayeem Gordon, and others shared and worked together towards the common goal and with the unity of purpose of distributing PCP and making money.  That evidence included the nine controlled purchases conducted by the DEA, the wiretap calls, and the kilogram of PCP and other paraphernalia recovered from the unit just above Hall's apartment at 3140 North Broad.  In particular, the wiretap calls captured Hall obtaining PCP, making plans to redistribute it to customers, and providing customer feedback. Nayeem, for his part, determined the manner and means of his operation, set prices, coached Hall on certain transactions, and ensured he was paid for whatever he supplied to Hall.  All this enabled the enterprise to profit from the drug distribution.  From this evidence, a rational trier of fact could find a conspiratorial relationship between Hall and, at the very least, Nayeem Gordon to distribute PCP in Philadelphia.

Finally, Hall argued that the evidence was insufficient to convict him of possession with intent to distribute on June 30, 2015, and July 24, 2015 (respectively, counts 43 and 44 of the third superseding indictment).[5]  At trial, the government introduced two phone calls from those

---

[5] The jury acquitted Hall on two additional counts of possession with intent to distribute (counts 45 and 46 of the

days that—in light of the other conspiracy evidence—supported a rational finding of guilt.  On June 30, 2015, Hall called Nayeem and said, "Bro, tell Maine to bring that four down," to which Nayeem responded, "I gotcha."  Approximately thirty-six seconds later, Nayeem called his brother Jermaine, asked him where he was, and directed him to "take Tone four down there for me."  Jermaine responded that he was in "the AP" and said, "All right. What? Apples?"  Sampson testified that "the AP" referred to the second-floor apartment at 3140 North Broad—the stash location for the Gordon organization and the place from which the PCP was distributed during the controlled buys.  He also explained that "apples" was a code word used by this group to refer to PCP.  About twenty minutes later, Nayeem called Jermaine again and asked if he gave the PCP to Hall, to which his brother responded, "yeah I gave it to him, yeah, he gave me seven."  Sampson testified that "seven" referred to payment of $700.  Based on these intercepted exchanges, a rational juror could conclude that Hall possessed PCP with intent to distribute it on June 30, 2015.

The same holds true for the other conviction.  On July 24, 2015, Jermaine Gordon told another individual to tell Nayeem: "I'm about to take Tone two apples but it ain't clear. It's the brown."  About an hour and a half later, Jermaine reported to Nayeem that "Tone gave me 350."  Sampson testified that the term "apple" referred to PCP; the statement, "it ain't clear; it's the brown," was Jermaine telling his brother that he gave Hall the brown colored PCP as opposed to PCP that was lighter in color; and, that both shades of PCP were purchased by the confidential source during the controlled buys.  He further testified that the term "350" referred to money or payment for the PCP supplied to Hall.  Viewed in the light most favorable to the government, this evidence could support a rational jury's finding of guilt on this possession count.

---

third superseding indictment).

In sum, there is not a reasonable probability that Hall would have been acquitted under Rule 29 had Ongay timely filed the motion. There was substantial evidence identifying Hall, connecting him to the enterprise, and establishing that he worked with its members to make money selling PCP throughout the conspiracy and on two particular dates.

### D. Evidentiary Hearing

A district court must hold an evidentiary hearing on a § 2255 petition "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Although this is a "reasonably low threshold," a defendant raising an ineffectiveness claim is not entitled to a hearing if he fails to demonstrate either deficiency of counsel's performance or prejudice. *United States v. Arrington*, 13 F.4th 331, 334 (3d Cir. 2021) (citing *United States v. McCoy*, 410 F.3d 124, 134 (3d Cir. 2005); *United States v. Dawson*, 857 F.2d 923, 927 (3d Cir. 1988)). Put differently, "if a nonfrivolous claim does not conclusively fail either prong of the *Strickland* test, then a hearing must be held." *Id.*

An evidentiary hearing is unwarranted for either of Hall's ineffectiveness claims. As described above, his first claim is "clearly contradicted by the record," *id.* at 335, which conclusively demonstrates that Chestnut's performance was not deficient. Chestnut tactically exposed the DEA's apparent lack of authorization to use Manuel Cruz as an informant for some of the controlled purchases. Similarly, Hall's claim that Ongay was ineffective "is not colorable" under *Strickland*'s prejudice prong, *id.* at 336, because Hall did not allege that a different outcome may have resulted and, even so, post-conviction relief under Rules 29 and 33 would have been denied.

### E. Certificate of Appealability

The only remaining issue is whether Hall should be granted a certificate of appealability

(COA), which is required for a defendant to pursue an appeal "from . . . the final order in a proceeding under section 2255." 28 U.S.C. § 2253(c)(1)(B). A COA may issue only if the defendant "has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, jurists of reason would not find the Court's conclusions debatable. As to Hall's first claim, considering what transpired at trial, a reasonable jurist could not conclude that Hall has overcome the "strong presumption" that Chestnut's performance was reasonable. *Strickland,* 466 U.S. at 689. And, because Hall's second claim fails on its face to address *Strickland*'s prejudice prong, no reasonable jurist could disagree with the Court's conclusion. Accordingly, a COA will not issue.

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, C.J.**